## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 5:22-CR-717 |
| | ) | |
| Plaintiff, | ) | JUDGE CHARLES E. FLEMING |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE CARMEN E. |
| | ) | HENDERSON |
| JEFFREY ROGERS, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Before the Court is Defendant Jeffrey Rogers's Motion to Dismiss Indictment.  (ECF No.
18).  Defendant alleges that 18 U.S.C. § 922(n)—the statute under which Defendant is charged in
this case—is unconstitutional based on the Supreme Court's ruling in *New York State Rifle &
Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).  The Government opposes Defendant's Motion,
arguing that 18 U.S.C. § 922(n) is analogous to firearms regulations in place during both the pre-
Founding, Founding, and Reconstruction eras of American history.  (ECF No. 20).  Defendant
filed a Reply Brief, emphasizing the disparities between 18 U.S.C. § 922(n) and the historical gun
laws cited by the Government, and maintaining that the Government cannot show a direct
historical analogy to § 922(n) because no direct historical analog exists.  (ECF No. 24).  For the
following reasons, Defendant's Motion is **DENIED.**

### I.    FACTUAL BACKGROUND

On December 23, 2020, Defendant was indicted for the unlawful discharge of a firearm at
or into a habitation in state court.  (ECF No. 14, Transcript of Jan. 19, 2023 Det. Hrg., PageID#
45–46; ECF No. 16, PageID# 74).  Defendant was released on bond following the indictment.
(ECF No. 14, PageID# 48).  On December 15, 2022, Defendant was indicted by a federal grand
jury for violating 18 U.S.C. §§ 922(n) and 924(a)(1)(D), having allegedly received a firearm and

1

ammunition while under the state-court indictment.  (ECF No. 1).  The Indictment alleges that Defendant, while under indictment for a crime punishable by imprisonment for a term exceeding one year, "did willfully receive a firearm . . . and ammunition, said firearm and ammunition, having been shipped and transported in interstate commerce, in violation of Title 18, United States Code, Sections 922(n) and 924(a)(1)(D)."  (*Id.* at PageID# 1).  The Indictment also includes a demand that Defendant forfeit the firearms and ammunition at issue.  (*Id.* at PageID# 1–2).

## II.    MOTION STANDARD

Defendant's Motion is governed by Federal Rule of Criminal Procedure 12(b)(3)(B)(v), which provides that a criminal defendant may move to dismiss an indictment for the Government's "failure to state an offense."  An indictment properly charges a criminal offense if it "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *Hamling v. United States*, 418 U.S. 87, 117 (1974).  The Court must take the indictment's factual allegations as true and decide only whether the indictment is "valid on its face."  *Costello v. United States*, 350 U.S. 359, 363 (1956); *see United States v. Williams*, 504 U.S. 36, 54–55 (1992) (limiting pretrial review of indictments to facial challenges).

## III.    DISCUSSION

### A.  *Bruen* and the Second Amendment

The Second Amendment of the Constitution provides that, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  In recent decades, the Supreme Court has interpreted the Second Amendment as codifying an individual person's "right to possess and carry weapons in case of confrontation" unrelated to militia service.  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 4

(2022) (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 592 (2008)).  *See* Adam Winkler, *Gun Fight: The Battle Over the Right to Bear Arms in America* 95 (2013) (explaining that the Second Amendment was understood as a mechanism to keep the federal government from disarming militias until the 1960s, when scholars began advancing the now-embraced "individual rights" theory).

*Bruen* expressed a clear, two-step framework for deciding the constitutionality of gun laws: first, the district court must decide whether the plain text of the Second Amendment covers an individual's conduct.  *Bruen*, 597 U.S. at 18.  If the Second Amendment's text covers a person's conduct, then the law is presumptively unconstitutional, and the Government has the burden of demonstrating "that the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Id.*  "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individuals' conduct falls outside the Second Amendment's 'unqualified command.'"  *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).  The Court's interpretation is based on recognition that the Second Amendment expresses a "pre-existing right . . . inherited from our English ancestors," and is derived not only from 17th century English law, but also from the public understanding of the Second Amendment as expressed through the writings of Founding-era leaders, the views of modern-era historians, and analogous arms-bearing laws in place when the Second Amendment was ratified.  *Id.* at 20 (citing *Heller*, 554 U.S. at 595–605).[1]

---

[1] The *Heller* plurality cited to a number of English laws from the late 1600s as antecedents to the Second Amendment, such as the 1671 Game Act, a pre-revolution gun regulation in England, which disarmed Protestants during the Catholic King Charles II's reign.  *Heller*, 554 U.S. at 593.  Also cited are scholars Joyce Lee Malcom (whose 1994 book, *To Keep and Bear Arms*, is referenced) and William Blackstone, the "preeminent authority on English law for the founding generation."  *Id.* at 593–94 (quoting *Alden v. Maine*, 527 U.S. 706, 715 (1999)).  The father of the individual-rights theory of the Second Amendment, Don Kates, is likewise cited for his scholarship in the 1980s.  *Id.* at 602; s*ee* Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 244 (1983).  St. George Tucker, William Rawle, and John Story—all postratification-era legal scholars— are also generously cited, along with contemporary legal scholar and historian, Stephen Halbrook, who focused his

The sort of "historical tradition" that supports the constitutionality of a modern gun law, however, is the subject of widespread debate.   In *Bruen*, the Court instructed lower courts to look for historical firearm regulations that are "relevantly similar" to the present-day law in question. 597 U.S. at 28–29.  The Court also directed lower court attention to historical laws in place first in 1791, when the Second Amendment was adopted, and second, in 1868, when the 39th Congress reconsidered the Second Amendment and reaffirmed that freed slaves were entitled to the "full and equal benefit" of the constitutional right to keep and bear arms.  *Id.* at 62.  Pre-Founding British common law can be persuasive, but not more persuasive than Founding-era or Reconstruction-era law.  *See Bruen*, 597 U.S. at 34–38 (discussing the weight historical regulations should be given in a modern Second Amendment analysis).  Laws too old (pre-dating the Second Amendment) or too young (born in the late 19th or early 20th century) may "confirm" the Court's understanding of established historical practices, but should not be the sole support for the constitutionality of a modern gun regulation.  *Id.* at 37.

One notable feature of both *Bruen* and its predecessor, *Heller*, is the Court's refrain[2] describing "the people" protected by the Second Amendment; the Second Amendment protects only "law-abiding" and "responsible" citizens.  *See, e.g.*, *Heller*, 554 U.S. at 625 ("For most of our history, . . . the Federal Government did not significantly regulate the possession of firearms by law-abiding citizens."); *id.* at 635 (explaining that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth

---

research on the Second Amendment during the Reconstruction-era in *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, 1866-1876* (1st ed. 1998).  In other words, while *Heller* did indeed focus on the history and tradition of American gun regulation, it did not confine itself to analogous Founding-era laws; rather, *Heller* grasped at the public understanding of the Second Amendment by holistically analyzing a variety of historical materials from a wide spectrum of sources.

[2] *Bruen* and its concurrences alone used the term "law-abiding, responsible citizens" and similar language more than a dozen times to describe the Second Amendment's scope.

4

and home"); *Bruen*, 597 U.S. at 5 ("In sum, the historical evidence from antebellum America does demonstrate that the manner of public carry was subject to reasonable regulation, but none of these limitations on the right to bear arms operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose."); *id.* at 6 (finding that American governments have not "generally required law-abiding, responsible citizens to demonstrate a special need for self-protection distinguishable from that of the general community to carry arms in public") (cleaned up).

*Heller's* dissenters likewise acknowledged that the Second Amendment's protected class includes only "law-abiding, responsible citizens," which necessarily does not include dangerous or irresponsible citizens.  554 U.S. at 644 (Stevens, J., dissenting).  *Heller's* plurality supports this reasoning:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626–27; *see Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring).  The Court described these and similar laws as "presumptively valid."  *Id.* at 627 n.26; *see McDonald v. City of Chicago*, 56 U.S. 742, 786 (2010) (reiterating that "the right to keep and bear arms is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," and that *Heller* "did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill").

1.  **Analogous Arms-Bearing Laws**

a.  *Pre-Founding*

The Government first points to the Militia Act of 1662, in place in England more than 100 years before the American Revolution.  (ECF No. 20, PageID# 183).  This Act empowered officers to "seize all arms in custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom."  Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662); see *Bruen*, 597 U.S. at 42 (calling "particularly instructive" the period of English history "between the Stuart Restoration of 1660 and the Glorious Revolution in 1688").  Similarly, "the act of 'going armed to terrify the King's subjects' was 'a great offence at the common law'" if committed with "evil intent or malice."  *Bruen*, 597 U.S. at 43–44 (quoting *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686)).  Thus, "by the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening the crown."  Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020).  The Government suggests, therefore, that "[t]he historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books."  *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012), *abrogated by Bruen*, 597 U.S. 1 (2022); (ECF No. 20, PageID# 184).

The Government also notes that at least four colonies or states had codified the common-law prohibition against "going armed offensively" and authorized the arrest of those who did.  *See* 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 52–53 (1869) (1692 statute); Acts and Laws of His Majesty's Provence of New Hampshire in New England;

with Sundry Acts of Parliament 17 (1771) (1701 statute); 1 Laws of the State of North Carolina, including the Titles of Such Statutes and Parts of Statutes of Great Britain as Are in Force in Said State 131–32 (1821) (1741 statute); Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force 33 (1794) (1786 statute); (ECF No. 20, PageID# 184).  The Government points out that three of those statutes required forfeiture of the offender's weapon as a consequence of their violation.  (*Id.*).

English and colonial American surety laws are similarly relevant.  Surety laws burdened the right to bear arms "only if another could make out a specific showing of reasonable cause to fear an injury, or breach of the peace."  *Bruen*, 597 U.S. at 56; (*see* ECF No. 20, PageID# 188).  The Government argues that there is an analogy between surety laws and § 922(n), because both promote public safety by temporarily restricting the gun rights of people believed to pose a threat.  (ECF No. 20, PageID# 189).  The surety practice existed in England, where it was "intended merely for prevention, without any crime actually committed by the party, but arising only from a probable suspicion, that some crime [wa]s intended or likely to happen."  4 William Blackstone, *Commentaries on the Laws of England* 249 (1769).

The American colonies continued the tradition of surety laws, authorizing officials throughout the colonies to arrest a person for disturbing the peace or going "armed offensively," and confiscate the person's gun "until he or she found such sureties for the peace and good behaviour."  Acts and Laws of His Majesty's Province of New Hampshire in New England 1–2 (1759).  *See* Acts and Resolves, Public and Private, or the Province of the Massachusetts Bay 52–53 (1869) (1692 statute); 2 Statutes at Large of Pennsylvania from 1682 to 1801, 23 (1896) (1700 statute); 1 Laws of the State of Delaware from the Fourteenth Day or October, One Thousand

Severn Hundred and Ninety-Seven 52 (1797) (1700 statute); Acts and Laws of His Majesties Colony of Connecticut in New England 91 (1901) (1702 statute). (ECF No. 20, PageID# 189–90).

### b. *Founding Era*

The American Revolution is evidence of America's departure from English legal practices and restrictions, not indicative of a lock-step regime. *See, e.g.*, Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 143 (2007) (describing the relationship of Founding-era American gun regulation as meaningfully "distinct from Great Britain in terms of practice, language, and law"). At the same time, "[t]he founding fathers borrowed liberally from the English Bill of Rights, including the right to petition government in the First Amendment, the sanctity of due process in the Fifth Amendment, and the right to keep and bear arms in the Second." Adam Winkler, *Gun Fight: The Battle Over the Right to Bear Arms in America* 102 (2013).

Nevertheless, the United States has an unfortunate history of categorically restricting firearm ownership for purported public safety reasons. *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 200 (5th Cir. 2012). "The earliest firearm legislation in colonial America prohibited Native Americans, Black people, and indentured servants from owning firearms." *Range v. Att'y Gen. United States*, 53 F.4th 262, 276 (3d Cir. 2022). As *Range* observed, these laws are repugnant and would be unconstitutional today; yet they show that "legislatures had the power and the discretion to use status as a basis for disarmament, and . . . that status-based bans did not historically distinguish between violent and non-violent members of disarmed groups." *Id.* at 276 n.18. Catholic people were similarly subjected to "loyalty oaths," requiring them to either denounce the Pope or give up certain constitutional rights, including the right to bear arms. *Id.* at 277.

8

The Government also points to the Judiciary Act of 1789 (passed two years before the Second Amendment's ratification), which empowered courts to detain an individual accused of a federal crime.  Act of Sept. 24, 1789, ch. XX, 1 Stat. 73, § 33 (1789); (ECF No. 20, PageID# 180). The Government observes that, at the time of the Founding, capital crimes—then including nonviolent offenses that we recognize as felonies today, like counterfeiting currency, embezzlement, and desertion from the army—were subject to mandatory detention.  *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C.C. 2019); *see Furman v. Georgia*, 408 U.S. 238, 355 (1972) (Marshall, J., concurring) (listing capital crimes in colonial New England, including "idolatry," "blasphemy," "assault in sudden anger," "adultery," "perjury in a capital trial," and "rebellion").

The Government reasons that the power to detain implies the power to impose lesser liberty restrictions.  (ECF No. 20, PageID# 169–71).  If a person has already been indicted when he is arrested, he loses his "Fourth Amendment right to a prompt judicial assessment of probable cause to support any detention."  *Kaley v. United States*, 571 U.S. 320, 329 (2014).  The Government can also freeze an indicted defendant's forfeitable assets—even if the defendant needs them to pay a lawyer—without violating the Fifth Amendment due-process right or the Sixth Amendment right to counsel.  *Id.* at 327–28.  The *Kaley* Court reasoned, "If judicial review of the grand jury's probable cause determination is not warranted . . . to put a defendant on trial or place her in custody, then neither is it needed to freeze her property."  *Id.* at 330.

The Government cites additional examples of restrictions on an indictee's Fifth and Eighth Amendment rights, including the holding in *United States v. Salerno*, 481 U.S. 739, 754–55 (1987); *Salerno* states that an individual's Fifth Amendment rights yield to "the government's regulatory interest in community safety," and that "[e]ven competent adults may face substantial liberty restrictions as a result of the operation of our criminal justice system."  *Id.* at 748–49.  In

*Bell v. Wolfish*, 441 U.S. 520, 550 (1979), the Court upheld a restriction on pretrial detainee's First Amendment right to receive particular reading material in jail because it was a rational response to security concerns.  (ECF No. 20, PageID# 170–71).

### c. *Reconstruction Era*

Between Founding and Reconstruction, surety laws increased in popularity.  Beyond the laws discussed in Section IIIA(1)(a), Massachusetts passed the surety law discussed in *Bruen* in 1836.  597 U.S. at 56 (citing Mass. Rev. Stat. ch. 134, § 16 (1836); *see Heller*, 554 U.S. at 605 (considering "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century").  *Bruen* notes that, "Between 1838 and 1871, nine other jurisdictions adopted variants of the Massachusetts law," which "required any person who was reasonably likely to 'breach the peace' and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm."  *Bruen*, 597 U.S. at 56 & n.23 (collecting citations).

### 2. **Public Attitudes and Understanding of the Second Amendment During the Founding Era**

While Founding-era Americans were not single-minded about the best language to enshrine the right to keep and bear arms in the Constitution, common themes can be teased from public commentary.  George Washington was concerned about unfettered access to firearms in America, suggesting that "combustibles in every State" would endanger the republic with threats of violent insurrection.  David Thomas Konig, *The Second Amendment: A Missing Transatlantic Context for the Historical Meaning of "The Right of the People to Keep and Bear Arms"*, 22 Law & Hist. 119, 149 n.86 (2004) (citing Don Higginbotham, *The Federalized Militia Debate: A Neglected Aspect of Second Amendment Scholarship*, 55 Wm. & Mary Q., 39, 40 (1998)).

When Pennsylvania and Massachusetts ratified the Constitution, both sought protections for the right to bear arms.  In Massachusetts, dissenters suggested alternative language: "[t]hat the people have a right to bear arms for the defense of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them *unless for crimes committed*, *or real danger of public injury from individuals*." Adam Winkler, *Gun Fight: The Battle Over the Right to Bear Arms in America* 108 (2013) (citing Robert H. Churchill, *Gun Regulation, the Police Power and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment,* 25 Law & Hist. Rev. 139, 168–69 (2007)) (emphasis added).

Dissenters in Pennsylvania sought very similar protections, proposing "[t]hat the people have a right to bear arms for the defense of themselves and their own state, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people, or any of them, *unless for crimes committed*, *or real danger of public injury*."  Churchill, *supra*, at 168–69 (emphasis added).  In Massachusetts, Samuel Adams suggested a change that "the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms."  *Id.* at 169 (emphasis added). Although these dissenters—Anti-Federalists—were ultimately unsuccessful in their efforts to modify the Second Amendment's wording, they published their proposals in the Dissent of the Minority of the Convention, which was both widely read and proved "highly influential."  *Heller*, 554 U.S. at 604.

When Massachusetts drafted its own Constitution in 1780, it provided for the protection of the right of the people "to keep and bear arms for the common defense."  Churchill, *supra*, at 169. Yet when the Massachusetts Constitution was circulated to towns for ratification, the town of

Williamsburg offered an edit: "that we esteem it an essential privilege to keep arms in our houses for our own defence and *while we continue honest and lawful subjects* to government we ought never to be deprived of them." *Id.* (emphasis added).  Challenges to the Massachusetts Constitution of 1780 were isolated to Williamsburg and one other town, *see id.*, yet they expose a plain public understanding: guns should be kept out of the hands of non-law-abiding citizens. Furthermore, since the Second Amendment codified such widely understood liberties, it is unlikely that "different people of the founding period had vastly different conceptions" of its intended scope. *Heller*, 554 U.S. at 603–05.

In 1868, during the Reconstruction era, the themes underlying the Second Amendment were still considered "obvious" to legal scholars.  Justice Thomas Cooley's treatise, described as "massively popular" in *Heller*, 554 U.S. at 616, explains that some groups were "almost universally excluded" from Second Amendment protections, including "the idiot, the lunatic, and the felon[.]"  Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868).

## B.  Application of *Bruen* to § 922(n)

### 1.  *Section § 922(n) Implicates the Second Amendment*

All of the Courts that have considered whether an individual under indictment is one of "the people" protected by the Second Amendment have found in the affirmative.  As one court explained, the unanimity among district courts on this subject is the product of *Bruen*'s conduct-focused analysis.  *United States v. Rowson*, 652 F. Supp. 3d 436, 458–59 (S.D.N.Y. 2023):

> No doubt because the class of persons implicated by the mandatory New York gun licensing statute included all who sought to carry firearms outside the home, the Court's focus in *Bruen* was not on potentially disqualifying status characteristics of the challengers to the statute.  It was instead on whether the Amendment's text covered the "*conduct*" the statute proscribed.

*Id.*  Since the Court referred to the underlying conduct at issue—possessing a firearm—the Court focused on whether "the Nation's historical tradition of firearm regulation" supported public possession of guns.  This approach in *Bruen* is supported in Justice Alito's concurrence, which states, "Our holding decides nothing about ***who*** may lawfully possess a firearm or the requirements that must be met to buy a gun."  597 U.S. at 72 (Alito, J., concurring) (emphasis added).

Turning to § 922(n), the conduct of shipping, transporting, or receiving a firearm likewise implicates the Second Amendment.  *Rowson*, 652 F. Supp. 3d at 459; *United States v. Quiroz*, 629 F. Supp. 3d 511, (W.D. Tex. 2022) ("The Second Amendment's plain text does cover 'receipt' and the Constitution presumptively protects such conduct."); *United States v. Holden*, 638 F. Supp. 3d 931, 936 (N.D. Ind. 2022), *rev'd on other grounds*, 70 F.4th 1015 (7th Cir. 2023) ("Receiving a firearm is necessarily a precursor to keeping or bearing a firearm, so Mr. Holden's conduct is presumptively protected by the Second Amendment."); *United States v. Stambaugh*, 641 F. Supp. 3d 1185, 1189 (W.D. Okla. 2022) ("[A]s a person who is presumed to be a law-abiding citizen until proven otherwise at trial, Stambaugh remains part of 'the people' whom the Second Amendment protects."); *United States v. Kelly*, No. 3:22-cr-00037, 2022 WL 17336578, at *3 (M.D. Tenn. Nov. 16, 2022) (noting that the act of receiving a firearm "is impossible to separate from the concept of 'bearing' a firearm," thus implicating the Second Amendment); *United States v. Hicks*, 649 F. Supp. 3d 357, 359–60 (W.D. Tex. 2023) (reasoning that, because one cannot "keep" or "bear" arms before "receipt" of those arms, conduct under § 922(n) is covered by the Second Amendment).

Though these district courts diverge on the question of § 922(n)'s constitutionality, they unanimously find that receiving a firearm is protected conduct under the Second Amendment. This Court sees no need to depart from this well-reasoned conclusion.  Moreover, as *Rowson* points

13

out, although the Supreme Court expressed "no doubt" about the constitutionality of laws prohibiting felons and the mentally ill from possessing firearms in *Heller*, *see* 554 U.S. at 626–27, most courts have declined to find felons and the mentally ill ***categorically*** excepted from the Second Amendment's protections.  *Rowson*, 652 F. Supp. 3d at 459–60 (citing *United States v. Woolsey*, 759 F.3d 905, 909 (8th Cir. 2014); *Kanter v. Barr*, 919 F.3d 437, 445–47 (7th Cir. 2019) ("Neither felons nor the mentally ill are categorically excluded from our national community.").  Accordingly, this Court holds that receipt of a firearm, even while under indictment, implicates the Second Amendment.  The Court must now review the history and tradition of regulating similar restrictions to determine whether § 922(n) is consistent with, or is an impermissible departure from, historical American tradition.

### 2. *Analogous gun laws and public attitudes in place before, during, and after the Founding indicate that § 922(n) is constitutional.*

#### a. *The Judiciary Act of 1789*

First, this Court is not persuaded that the Judiciary Act of 1789 is an appropriate historical analog to § 922(n).  Although at least one court has looked favorably upon the Government's analogy, *see United States v. Fencl*, No. 21-CR-3101, 2022 WL 17486363, at *3–4 (S.D. Cal. Dec. 7, 2022), that Court was not tasked with deciding the constitutionality of § 922(n); rather, *Fencl* upheld the constitutionality of Standard Condition 4, which prevents indictees released on bond from possessing firearms.

The problem with justifying § 922(n) based on the Judiciary Act of 1789 is that the two are not "relevantly similar."  *See Bruen*, 597 U.S. at 29.  Whether and when the Government historically denied bail to indictees—and consequently, whether and when those pretrial detainees necessarily suffered liberty restrictions as the result of their detention—does not speak to public attitudes or understandings of the scope of a person's right to keep and bear arms.  The Judiciary

Act of 1789 restricted the individual liberties of pretrial detainees well beyond the individual's personal liberty; as the Government notes, pretrial detainees had numerous constitutionally protected liberties restricted while detained.  Therefore, the Government argues that the Judiciary Act of 1789 is a proper analog to § 922(n) because the right to keep and bear arms is just another liberty restriction incidental to detention.

But that argument is undermined by the Supreme Court's decision in *Bell v. Wolfish*, 441 U.S. 520, 550 (1979), which upheld a burden on a pretrial detainee's First Amendment right to receive particular reading material.  The Court upheld that restriction not because the ability to detain a person implies the ability to restrict the person's other liberties, but because the restriction on reading material was "a rational response by prison officials to an obvious security problem." *Id.*  In so holding, the Court observed that hardcover books are "especially serviceable for smuggling contraband into an institution; money, drugs, and weapons easily may be secreted in the bindings." *Id.* at 550–51.

While the Court has upheld liberty restrictions otherwise protected by the Fourth, Fifth, Sixth, and Eighth Amendments, those decisions were likewise not based solely on the ability to detain.  In *Kaley*, the Court held that lower courts do not weigh the reliability or competency of the evidence considered by the grand jury; therefore, if that evidence is enough to detain the accused person, it is also enough to enjoin that person's use of disputed assets subject to forfeiture. 571 U.S. at 328; *see United States v. Williams*, 504 U.S. 36, 54 (1992) (limiting pretrial review of indictments to facial challenges).  In *Salerno*, the Court upheld restrictions on an accused person's Fifth Amendment due process rights (infringed because he was detained pretrial) and the constitutionality of money bail under the Eighth Amendment because of the government's compelling interest in regulating the conditions of pretrial release.  481 U.S. at 747 & 752–53.

Even these decisions are distinguishable from *Bell v. Wolfish*, however, which upheld the First Amendment restriction not based on the overall system of pretrial detention or bail in America, but upon the security needs of a pretrial detention facility. This Court views the restriction on pretrial possession of firearms by detainees in a similar light, given the obvious security concerns that would attend prisoners having guns. While the Court justified the holding in *Bell v. Wolfish* by balancing the accused person's interest in retaining his First Amendment right against the penal institution's legitimate goals and policies, *Bell*, 441 U.S. at 546–47, this is the very type of reasoning that *Bruen* forbids.

While the Judiciary Act of 1789 (as the Government uses it here) applies only to pretrial detainees, § 922(n) effectively only applies to indictees who have been released pending trial; a pretrial detainee is presumably unable to have a weapon in jail. The type of conduct that corresponds to each law is diametrically opposite: either a person is detained, and therefore prevented from receiving a gun due to jail security protocols, or the person is not detained, and the only thing keeping that person from possessing a gun pretrial is § 922(n).[3] Indeed, while the Court accepts that a pretrial detainee's inability to receive a weapon while under indictment is similar to a bailed indictee's inability to receive a weapon while under indictment, this Court does not believe that it is "relevantly similar," such that it can justify § 922(n) under a properly-conducted *Bruen* analysis.

b. *Historic Surety Laws*

The Government's more persuasive argument lies in the numerous similarities between § 922(n) and pre- and post-Founding surety laws. At least three other district courts have held

---

[3] The Court's standard conditions of bond also preclude an indictee who has been released on bond from receiving a gun, but those conditions are not at issue here.

similarly.  *See United States v. Kays*, 624 F. Supp. 3d 1262, 1628 (W.D. Okla. Aug. 29, 2022) (finding "that surety laws discussed in *Bruen* are proper historical analogues for § 922(n)"); *United States v. Fencl*, No. 21-CR-3101, 2022 WL 17486363, at *3–4 (S.D. Cal. Dec. 7, 2022) (finding that surety laws support Standard Condition 4, which bars an indicted person from possessing a gun while released pending trial); *Perez-Garcia*, No. 22-CR-1581, 2022 WL 17477918,a t *4–5 (S.D. Cal. Dec. 6, 2022) (same).  (ECF No. 20, PageID# 190).  While it is true that the Government's discussion of surety laws begins more than 100 years before the Founding, it ends around the time of Reconstruction; surety laws were in place for more than 200 years in America, making it a practice that is definitional of the word "tradition."[4]

The similarities between surety laws and § 922(n) are illuminated by a textual approach as well.  Black's Law Dictionary defines an "indictment" as "[t]he formal written accusation of a crime, made by a grand jury and presented to a court for prosecution against the accused person. . . . The act or process of preparing or bringing forward such a formal written accusation."  Black's Law Dictionary, *Indictment* (11th ed. 2019).  An indictment that is both "fair upon its face" and returned by a "properly constituted a grand jury" conclusively demonstrates probable cause to believe the accused person committed the crime charged.  *Kaley v. United States*, 571 U.S. 320, 328 (2014) (citing *Gerstein v. Pugh*, 420 U.S. 103, 1177 n.19 (1975)).

The surety process, in essence, protected public safety before, during, and after the Founding era.  During the Founding era, if a person could make "a specific showing of reasonable cause," or as William Blackstone put it, "probable suspicion," that the accused person was "reasonably likely to breach the peace," then the accused person suffered a temporary restriction

---

[4] Merriam-Webster Dictionary defines "tradition" as "an inherited, established, or customary pattern of thought, action, or behavior (such as a religious practice or a social custom)."  Merriam-Webster Dictionary, *Tradition*, https://www.merriam-webster.com/dictionary/tradition [https://perma.cc/V6SG-2H4G].

of his right to keep and bear arms.  *Bruen*, 597 U.S. at 56 & n.23; 4 William Blackstone, *Commentaries on the Laws of England* 249 (1769).  While some surety laws required only that the accused person post a monetary bond before continuing to carry his weapon publicly, such as the 1836 Massachusetts surety law discussed in *Bruen*, 597 U.S. at 55–56, others required the accused person to forfeit his weapon.  *See, e.g.*, Acts and Resolves, Public and Private, or the Province of the Massachusetts Bay 52–53 (1869) (1692 statute); 2 Statutes at Large of Pennsylvania from 1682 to 1801, 23 (1896) (1700 statute); 1 Laws of the State of Delaware from the Fourteenth Day or October, One Thousand Severn Hundred and Ninety-Seven 52 (1797) (1700 statute); Acts and Laws of His Majesties Colony of Connecticut in New England 91 (1901) (1702 statute).

Defendant's arguments against the use of surety laws to justify § 922(n)'s burden on the right to keep and bear arms ignore many of these facts.  Defendant attempts to use surety laws in the same way that *Bruen* did, claiming the Court has already expressed that such laws do not support a categorical ban on public carry.  *See Bruen*, 597 U.S. at 56; (ECF No. 24, PageID# 217).  The question before this Court, however, is different than the question before the *Bruen* Court.  *Bruen* was concerned with the constitutionality of New York's public carry statute, which imposed a ban on public carry unless a person could show a special need to be armed.  *Id.* at paragraph one of the syllabus.  Here, there is no "ban" at issue.  Rather, § 922(n) functions in the same way that *Bruen* described surety laws: it presumes *"*that individuals had a right to public carry that could be burdened only if another could make out a specific showing of 'reasonable cause to fear an injury, or breach of the peace."  Since surety laws disarmed a person only when "attended with circumstances giving just reason to fear that" an accused person intends "to make an unlawful use of" firearms, they are relevantly similar to § 922(n), which temporarily disarms persons only after being indicted based on a probable cause finding by a grand jury.  *See Bruen*, 597 U.S. at 56.

18

In sum, while not historical twins, surety laws are the type of relevant, conduct-based, historical analogs that justify § 922(n)'s burden on a person's Second Amendment rights today. The continued use of surety laws from pre-Founding through post-Founding confirms that Americans were concerned about arming individuals believed to have dangerous inclinations. Dissenters and Anti-Federalists in Pennsylvania and Massachusetts, including among them George Washington and Samuel Adams, wanted the Second Amendment to insure against the risk of public injury by dangerous persons. By the time of Reconstruction, Thomas Cooley echoed many of the same ideas. This longstanding public concern, evidenced by the practice of invoking surety laws, establishes an American tradition of temporarily disarming potentially dangerous individuals in the name of public safety. The Government has met its burden of establishing that § 922(n) is consistent with the history and tradition of gun regulation in the United States. The Court holds that § 922(n) is constitutional.

### 3.  The Indictment States an Offense

The Indictment charges Defendant with violation of 18 U.S.C. §§ 922(n) and 924(a)(1)(D), Receipt of Firearm and Ammunition While Under Indictment. (ECF No. 1). Title 18 U.S.C. § 922(n) makes it a crime for an individual "under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." Title 18 U.S.C. § 924(a)(1)(D) requires any person who "willfully violates [§922(n)]" to be fined, imprisoned for not more than five years, or both.

Here, the one-count Indictment alleges that Defendant, while under indictment for a crime punishable by imprisonment for a term exceeding one year, "did willfully receive a firearm . . . and ammunition, said firearm and ammunition, having been shipped and transported in interstate

commerce, in violation of Title 18, United States Code, Sections 922(n) and 924(a)(1)(D)."  (*Id.* at PageID# 1).  The Indictment also includes a demand that Defendant forfeit the firearms and ammunition at issue.  (*Id.* at PageID# 1–2).  The Indictment fairly informs Defendant of the charge(s) he must defend against and enables him to enter a plea in bar of future prosecutions for the same offense.  Therefore, the Indictment states an offense against Defendant, and the Motion to Dismiss Indictment must be denied.

## IV.     CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss Indictment (ECF No. 18) is hereby **DENIED.**  The Court will reset the trial schedule in this matter in a separate Order.

**Date: February 20, 2024**

**IT IS SO ORDERED.**

**CHARLES E. FLEMING**
**U.S. DISTRICT COURT JUDGE**